**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re   JACQUELINE R. MARSHALL, | : | Chapter 7 |
| | : | |
| Debtor | : | |
| | : | Bky. No. 18-15802 ELF |
| | : | |
| AMERICAN FEDERATION OF STATE, | : | |
| COUNTY, AND MUNICIPAL EMPLOYEES, | : | |
| LOCAL 2187, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Adv. No. 18-254 |
| | : | |
| JAQUELINE R. MARSHALL, | : | |
| | : | |
| Defendant | : | |

# O P I N I O N

## I.  INTRODUCTION

In this adversary proceeding, the American Federation of State, County and Municipal Employees Local 2187 ("Local 2187") alleges that Debtor Jacqueline Marshall ("the Debtor"), the former president of Local 2187, overpaid herself and otherwise facilitated improper expenditures of union funds totaling $78,966.35.  Local 2178 seeks a determination that this debt is nondischargeable pursuant to 11 U.S.C §§ 523(a)(2) and (a)(4).

As explained below, for the purpose of analyzing nondischargeability under §523(a), I find the "debt" at issue to be comprised of three (3) distinct components:

(1) an overpayment of salary in the amount of $41,575.00 received by the Debtor from March 2013 to July 15, 2015 ("the First Overpayment");

(2) a second overpayment of salary in the amount of $34,563.25 received by the Debtor after she was removed from office on July 15, 2015 through November 2015 ("the Second Overpayment"); and

(3) certain expenditures of union funds in the amount of $2,827.95 improperly made on the Debtor's behalf ("the Transcript Costs").

For the reasons explained below, I conclude that:

(1) the portion of the First Overpayment received by the Debtor from April 21, 2014 to July 15, 2015 is nondischargeable pursuant to 11 U.S.C. §523(a)(4);

(2) the Second Overpayment is nondischargeable pursuant to 11 U.S.C. §523(a)(2); and

(3) the Transcript Costs are dischargeable.

## II. PROCEDURAL HISTORY

The Debtor filed a voluntary petition under chapter 7 of the Bankruptcy Code on August 31, 2018. In her bankruptcy schedules (Schedule E/F), she listed a debt to Local 2187 in the amount of $78,966.35. This debt is based on two (2) AFSCME International Judicial Panel decisions: Judicial Panel Case No. 14-73, dated July 6, 2015 ("the First Panel Decision") and Judicial Panel Case No. 16-32, dated July 8, 2016 ("the Second Panel Decision").

On October 29, 2018, Local 2187 filed an adversary complaint, asserting that the debt is nondischargeable pursuant to 11 U.S.C. §523(a)(2)(A) and §523(a)(4).[1]

---

[1]      11 U.S.C. §523(a), in pertinent part, provides an exception to the chapter 7 discharge for any debt

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by —

*[f.n. cont.]*

Trial was held on August 16, 2019.  Local 2187 presented two (2) witnesses: Robert

Coyle, AFSCME Local 2187 President and Catherine Scott, District Council 47 Executive Board

Member (and former president of the Local). The Debtor testified in her defense against Local

2187's claims.

After the conclusion of the trial, I took the matter under advisement and set a briefing

schedule.  Both parties submitted post-trial briefs in November 2019.


### III.  FINDINGS OF FACT

Upon consideration of the pleadings, stipulated facts, documentary evidence, testimony

presented at trial, and the post-trial submissions, I make the following findings of fact. In making

these findings, I have resolved the conflicting testimony of the witnesses by considering their

credibility and demeanor, the plausibility of their testimony, the existence of corroborating

circumstantial, testimonial or documentary evidence and the totality of the evidentiary record.

---

*[f.n. cont.]*

> (A) false pretenses, a false representation, or actual fraud, other than a
> statement respecting the debtor's or an insider's financial condition
>
> **.  .  .**
>
> (4)  for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or
> larceny.

**The Debtor's Employment History**

1. The Debtor began working for the City of Philadelphia as a social worker in 1987.  (Audio at 9:32-34). She also became a member of Local 2187, the union for all administrative, professional, and technical employees of the City of Philadelphia.  (Ex. P-1; Audio at 9:24).

2. In 1988, the Debtor obtained her first position with Local 2187 as a Steward.  After approximately four years, she served on Local 2187's executive board.[2]

3. In 2007, the Debtor went back to her position as a Steward and remained in that role for approximately five years until she was elected president of the union local in the winter of 2012. (Audio at 9:18-9:19).

4. In March 2013, the Debtor left her employment (with the City to assume her role as president of Local 2187. (Audio 9:32-9:34).

**Local 2187**

5. Local 2187 has approximately 5-6 full-time employees and many part-time employees, some of whom serve as officers.  (Audio at 9:21-23).

6. The president of Local 2187 serves full-time as the administrative and executive officer of Local 2187.  The president's responsibilities include, but are not limited to, the following:

- ensuring that all AFSCME constitutional requirements are carried out;

- ensuring the Local's compliance with financial standards and reporting;

- oversight of payroll and ensuring proper salaries are paid;

---

[2]     The executive board for Local 2187 consists of fourteen (14) individuals including: the president, the vice-president, the recording secretary, the secretary-treasurer, a union agent and nine (9) other executive board members.  (Constitution for Administrative, Professional and Technical Association) (Ex. P-1, at 2).

- countersigning all checks drawn against the funds of the Local;

- ensuring negotiations and implementation of contracts with employers.

(Ex. P-1 at 3; Audio at 9:19-9:20).

7. The president's oversight of payroll involves a final review of the check <u>after</u> the bookkeeper generates the payroll and the secretary/treasurer has reviewed it. (Audio at 9:23). The review requires the president to verify the correct hourly rate, supporting documentation for the number of hours and that calculations are correct.  (Audio at 9:23).

8. The pay rates for Local 2187 employees are set by the same pay scale as the City's professional employees who are otherwise members of Local 2187.  This pay scale is referred to as the Executive Pay Range ("EP"). (Ex. P-4; Audio at 9:24).

9. Each EP has five (5) "Steps," which represents an annual rate of pay.  Employees typically start at Step 1 of the job's EP Range.  An employee can move to the next higher Step, pursuant to Local 2187's collective bargaining agreement, if the employee has served one year in the position and has a satisfactory performance evaluation.  Calculation of one year of service is based on the employee's date of hire.  An employee may get to Step 5 within 5 years on the job, assuming the employee is in "good standing."  (Audio 9:25-9:26).

10. Everyone who works for the City or Local 2187 should know the EP and Step for their respective position.  If an employee of the City or the Local changes jobs, the employee's salary may be adjusted based on the EP level for the new position and the employee's hiring date.  The EP and Step of the predecessor employee has no bearing in that determination. (Audio 9:26. 9:34-39).

11. The AFSCME Local 2187 Personnel Practices Code (the "Personnel Practices Code") sets forth the rules governing status, pay, leave time and other benefits for Local 2187 officers and employees. (Ex. P-2, Personal Practices Code, revised 4/23/2008; Audio at 9:28).

12. The Personnel Practices Code also determines EP levels for all staff, but specifically states that Step and anniversary date determinations are made in accordance with the applicable City's Civil Service Regulations.  (Ex. P-2, at Section 4.015, Audio at 9:28-29).

13. The Personnel Practices Code and pay range scales (EP and Step) are available to all officers and members of Local 2187.  (Exs. P-2; P-3, Personnel Practices Code, revised 10/1/2014; Ex. P-4, AFSCME D.C. 47 Local 2187 Pay Ranges; Audio at 9:31).

14. The executive board reviews the Personnel Practices Code annually. (Audio at 9:32).

15. The Debtor was familiar with the Personnel Practices Code during her time with the Local, prior to taking office as president.  (Audio at 9:54).

### The Debtor's Salary as President from March 2013 through May 19, 2014

16. When the Debtor left her position with the City to become the president in 2013, she was a "Social Worker II" earning a salary at EP18, Step 5, which equated to an annual salary of $54,218. (Ex. P-4; Audio at 9:31-34).

17. The Debtor believed her salary would increase once she became the president but did not receive any personalized, written documentation about her new EP and Step prior to assuming her new role.  She met with the bookkeeper, to discuss her salary, three (3) days after she started in her position as president. (Audio at 9:41, 9:58-9:59; 10:54-10:55).

18. In 2013, the year the Debtor assumed her role as president, the Personnel Practices Code provided an EP Level of 26 for the president. Step was not referenced. (Ex. P-2).

19. The appropriate starting EP and Step for the Debtor was EP 26, Step 1, which equated to $68,291. (Ex. P-8 at 15; Audio 9:34-39).

20. The Debtor was improperly placed at EP 26, Step 5, which equates to $87,799, when she commenced her role as president.  (Ex. P-8; 9:32-9:34).[3]

21. In early 2014, almost one (1) year into the Debtor's term as president, Robert Coyle, a member of the executive board and the Local's budget committee, asked the Debtor to provide him with certain financial information, including the officers' salaries.  Coyle made several requests from February through March 2014.  The Debtor did not directly provide Coyle with any documentation, but rather directed his requests to Local 2187's bookkeeper, Janice Shippen. (Exs. P-10 through 12; Audio 9:37-9:39).

22. On April 21, 2014, during an executive board meeting, the Debtor learned certain executive board members believed she was overpaying herself.  The meeting ended abruptly after a fellow board member, Ms. Robinson, called her a "thief." (Ex. D-1; Audio at 9:55-56,10:11).[4]

---

[3]      The Debtor's predecessor, Kahim Boles, was receiving a salary at level EP 26, Step 5 when he left office.  Boles served as president for 5 years (from 2007-2012). (Ex. P-8; 9:32-9:34).

[4]      Initially, the Debtor testified in response to court's questioning that this inflammatory incident occurred at a meeting in the fall of 2013.  On redirect examination, she changed her testimony to state that the meeting referenced in Finding of Fact No. 22 above occurred in April 2014, not the fall of 2013. The Debtor stated that her recollection was refreshed by her review of the draft minutes of that contentious meeting.  (Ex. D-1; Audio at 10:12).

      On this point, I credit the Debtor's testimony and find that she first became aware of the allegations that she was being overpaid on April 21, 2014.

## The Debtor's Salary as President after May 19, 2014

23. In May 2014, the executive board voted to decrease salaries for the president, union agent

and staff representatives, effective May 19, 2014. (Ex. P-3; Audio at 10:00).

24. The Debtor expected and understood her EP would move from EP 26 to EP 25 as a result of

the EP Reduction, thereby reducing her pay. (Audio 9:26-30; 9:44-46; 10:01)

25. Despite the executive board's action, the Debtor's EP level and pay were not reduced

effective May 19, 2014. (Exs. P-5 & P-6; Audio 10:01).

26. On July 16, 2014, two months after the EP reduction went into effect, the Debtor's paycheck

finally reflected a reduction from EP 26 to EP 25.  The EP reduction did not affect the

Debtor's Step level; she remained at Step 5. (Exs. P-6, P-7 & P-8 at 15).

27. Between May 10, 2014 and July 16, 2016, the Debtor never checked her paystub to verify the

existence or accuracy of the mandated salary reduction. (Audio at 10:02).

28. The proper pay rate that should have gone into effect on May 19, 2014 for the Debtor was EP

25 at Step 2, which would have reflected that she passed her first anniversary as president.

(Ex. P-8; Audio at 9:44-46).


## The August 2014 Charges and the First Panel Decision

29. On or about August 6, 2014, six (6) members of Local 2187 filed several charges against the

Debtor and other union members including Gary Bryant, the secretary-treasurer before the

Judicial Panel provided for in the AFSCME Constitution ("the Panel"), asserting the

"misappropriation, embezzlement, or improper or illegal use of union funds."  (Audio at

9:53).

30. The Debtor understood from her review of the charges filed against her that the alleged

overpayment of her salary was due to her prior EP and improper Step. (Audio at 10:03).

31. Between August 2014 and July 2015, while the charges were pending, the Debtor remained

in her office as president and maintained her salary at EP 25, Step 5.  During this time, the

Debtor and the secretary-treasurer, Bryant, were the only individuals who could have

adjusted her pay because they were the only officers who had check writing authority. The

executive board had no ability to make the change; its power was limited to filing charges.

(Audio 10:13-14).

32. On July 6, 2015, the Panel issued a decision ("the First Panel Decision").  The First Panel

Decision:

- determined that the Debtor violated the International Union Constitution by receiving
  an overpayment in wages;

- ordered the Debtor's immediate removal from office;

- suspended the Debtor from seeking or holding any elected position at any level of the
  Union for a period of 4 years;

- ordered the Debtor to pay back the sum of $33,994.21 for the overpayment of wages
  from March 2013 through April 5, 2015, and all overpayment of wages up to date,
  had she been correctly placed on the pay schedule at EP 26, Step 1 in March 2013;

- ordered the Debtor to reimburse any vacation or sick leave buyout in excess of the
  difference of starting at EP 26, Step 1 and starting at EP 26, Step 5 for all years of any
  buyout.

(Ex. P-8; Audio at 9:43-44).

33. The entire sum the Debtor was required to repay as a result of the First Panel Decision was

$41,575.15: the First Overpayment. (Id.).[5]

---

[5]        In the First Panel Decision, the Panel found that it was unlikely that the Debtor knew how salary
should have been determined at the time she assumed her position as president.  (Ex. P-8 at 11)
("President Marshall most likely was not knowledgeable of how placement should have occurred").

34. The Debtor appealed the decision to the full AFSCME Judicial Panel and requested a stay to the decision pending a full Judicial Panel decision.  Her request for a stay was denied and on October 29, 2015, the full Judicial Panel unanimously upheld the First Panel Decision in its entirety. (Ex. P-9 at 4; Audio at 10:01).

### The Administratorship of Local 2187 after the Debtor's Removal as President

35. Upon the Debtor's removal from office in July 2015, the executive board was disbanded and Local 2187 was placed under an administratorship by the President of the international union with which Local 287 is affiliated.  James Spears became the administrator, but the day-to-day operations of the Local were overseen by deputy administrator, Vanessa Fields.[6]  (Ex. P-9, Second Panel Decision at 13; Audio at 9:57-10:00)

36. On July 21, 2015, Fields, as deputy administrator, sent a letter to the City of Philadelphia stating that the Debtor had ended her leave of absence for union business and was returning to full-time employment on November 16, 2015 and that Debtor would be "running out her accrued time."  (Ex. P-9 at 5-6).

37. Between July 2015 and November 2015, the Debtor was no longer working for Local 2187, but continued to receive a biweekly check at the EP 25, Step 5 level.  She had yet to make any payment to comply with the First Panel Decision and she knew these checks she continued to receive were at the improper Step level.[7]  (Audio at 11:13-14).

---

[6]    Fields and the Debtor were well acquainted.  In fact, Ms. Fields ran on the Debtor's slate for president.  (Audio at 10:17-20)

[7]    The Debtor testified that she was told that these payments were approved by the administrator and that the payments were for earned time vacation and sick time. (Audio at 11:13-14).  I do not credit this testimony.

38. On December 10, 2015, shortly before the administratorship was lifted on December 15,

2015, Spears tried to establish a repayment schedule for the Debtor, beyond the 60 days

initially mandated by the First Panel Decision.  (Ex. P-9 at 13; Audio at 10:27-31).

### New Charges against the Debtor and the Second Panel Decision

39. In March 2016, new charges were brought against the Debtor for:

- her failure to comply with the First Panel Decision;

- continuing to improperly receive her salary and have her benefits paid after she was removed from office; and

- the improper use of the union's resources to order copies of the transcript from the First Panel Decision.

(Ex. P-9).

40. Charges were also filed against Bryant and Fields for improper use of union resources.  (Id.).

41. On July 18, 2016, the Panel issued the Second Panel Decision, finding that the Debtor:

- violated (again) the International Constitution and was guilty of all charges;

- failed to abide by the restitution order of the First Panel Decision;

- improperly received $34,563.25 in wages and benefits after her removal from office from July 17, 2005 through November 30, 2015, the Second Overpayment;[8] and

- improperly benefited from the expenditure of $2,827.95 from Local 2187 funds to pay for the transcripts in the First Panel Decision ("the Transcript Costs").[9]

---

[8]     The Second Panel determined that, upon her separation, the Debtor was not entitled to sick leave payout, floating holidays, or administrative days. While it was less clear whether she was entitled to any immediate payout of vacation days or accrued compensatory time, the Second Panel concluded she was entitled to nothing because the Debtor's time records were "troubling" and "riddled with holes." (Ex. P-9 at 18).

[9]     The record showed that the Debtor's attorney ordered the transcript; that Mr. Bryant, as the

*[f.n. cont.]*

*[f.n. cont.]*

(Ex. P-9; Audio at 10:03).[10]

42. The Second Panel Decision ordered the Debtor to make restitution to Local 2187 for a total

of $78,966.35 consisting of the First Overpayment of $41,575.00, the Second Overpayment

of $34,563.25 and the Transcript Costs of $2,827.95.  It also determined that the Debtor's

conduct warranted restitution and expulsion from the union.  (Ex. P-9).

43. On September 23, 2016, the full Judicial Panel affirmed the Second Panel Judgment in its

entirety.

44. The Debtor's continuing, wrongful receipt of the First Overpayment and Second

Overpayment from April 2014 through November 2015 was knowing, wrongful and made

with fraudulent intent.


## IV.  DISCUSSION

### A.  Applicable Legal Standards

### 1.  nondischargeability, generally

A central purpose of the Bankruptcy Code is to give the honest debtor a fresh start,

unburdened by the weight of preexisting debt. See, e.g., In re Cohn, 54 F.3d 1108, 1113 (3d

---

 treasurer, bore some responsibility for the improper expenditure, but that the primary responsibility
rested with the Debtor and her attorney because neither the executive board nor the membership of the
union approved the expenditure. (Exs. P-8 at 15; P-9 at 15).


[10]       In the Second Panel Decision, the Panel found that the Second Overpayment was authorized and
facilitated by Fields, who was found guilty of violating the International Constitution by breaching her
responsibility to maintain the fiscal integrity of the union.  However, the Panel did not impose a
restitution requirement on Fields because she was not personally enriched. She was suspended from the
Federation for a period of two (2) years and denied the right to hold or seek any elected office at any level
of the union for four (4) years.  (Ex. P-9).

Cir.1995); In re Marques, 358 B.R. 188, 193 (Bankr. E.D. Pa. 2006). Thus, the statute's

exceptions to the discharge of indebtedness are strictly construed against creditors. E.g., Cohn,

54 F.3d at 1113; In re Glunk, 455 B.R. 399, 416 (Bankr. E.D. Pa. 2011); Marques, 358 B.R. at

193.  A party seeking an exception to discharge bears the burden of proof.  In re Bell, 498 B.R.

463, 476 (Bankr. E.D. Pa. 2013).  Each element of the nondischargeability claim must be

established by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 288–89, 111 S.

Ct. 654, 660, 112 L. Ed. 2d 755, 766 (1991); In re Roemmele, 2011 WL 4804833, at *4 (Bankr.

E.D. Pa. Oct. 11, 2011).

### 2.  §523(a)(2)(A)

Section 523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A), excepts from

discharge debts arising from three (3) similar, but distinct, types of misconduct: (1) false

pretenses; (2) a false representation and (3) actual fraud. See e.g., In re Ricker, 475 B.R. 445,

456 (Bankr. E.D. Pa. 2012).[11]

The three (3) different types of conduct that give rise to nondischargeability under

§523(a)(2) all require that a plaintiff prove false or deceptive conduct, fraudulent intent, and

justifiable reliance. See In re Altieri, 2012 WL 3595298, at *2 (Bankr. D.N.J. Aug. 20, 2012).

Thus, "[t]o be actionable under § 523(a)(2)(A), the debtor must act with scienter, regardless of

---

[11]      In Ricker, I observed that

> false representations" [involve] affirmative statements that are false or misleading. "False
> pretenses," on the other hand, entail implied misrepresentations, omissions, or failures to
> disclose material facts that create a false impression which is known to the debtor. As for
> "actual fraud," . . .  the term refers to conduct other than classic factual
> misrepresentations, which involve "any deceit, artifice, trick, or design involving direct
> and active operation of the mind, used to circumvent and cheat another.

475 B.R. at 456.  As discussed just below in the text, the discussion of "actual fraud" in Ricker is
consistent with the subsequent 2016 U.S. Supreme Court decision on the subject.

whether the creditor alleges that the debtor's conduct constituted false pretense, a false representation or actual fraud." In re Steinberg, 2017 WL 1184314, at *4 (S.D.N.Y. Mar. 29, 2017).

In this case, where Local 2187's claim is based partly on the Debtor's inaction  (i.e., the Debtor's acceptance of  compensation to which she was not entitled), and partly on a manipulation of union funds with the assistance of other union personnel  -- rather than on affirmative misrepresentations or misleading nondisclosures  --  I interpret Local 2187's claim as being based on the "actual fraud" prong of §523(a)(2)(A).  So, I will limit my discussion to that part of the statute.

In Husky Int'l Elecs., Inc. v. Ritz, 136 S. Ct. 1581 (2016), the Supreme Court held that "actual fraud" is a concept distinct from "false representation."  Id. at 1586.  The Court interpreted the two parts of "actual fraud" — "actual" and "fraud" — according to their common law roots.

"Actual" fraud denotes any common law fraud that "involves moral turpitude or intentional wrong."  The Court contrasted "actual" with "implied" fraud or fraud "in law," which involve acts of deception that "may exist without the imputation of bad faith or immorality." Id. Although the Court noted that the broad concept of common law "fraud" was difficult to define precisely, it observed that it "connotes deception or trickery generally."  Id.  The Court did observe, however, that fraud historically included so-called fraudulent conveyance, which was not an inducement-based fraud.  Thus, a debtor need not make any misrepresentations to have committed "actual fraud" under §523(a)(2)(A) — "acts of concealment and hindrance" would suffice.  Id. at 1587.

14

Putting the pieces together, the Court held that "actual fraud" under §523(a)(2)(A) includes "anything that counts as 'fraud' and is done with wrongful intent."  Id. at 1586.

Accordingly, to establish that a debt is nondischargeable under the "actual fraud" prong of § 523(a)(2)(A), a creditor must prove that (1) the debtor engaged in actual fraud (i.e., any fraud that involved moral turpitude or constituted an intentional wrong); (2) the debtor obtained money, property, services or credit by engaging in actual fraud; and (3) the debt arose from the actual fraud.  In re Kaplan, 608 B.R. 443, 450 (Bankr. E.D. Pa. 2019) (quoting In re Sheaffer, 2017 WL 377941, at *4 (Bankr. M.D. Pa. Jan. 25, 2017)).  In other words, "a creditor must prove that a debtor took some action in furtherance of his wrongful intent, that the fraudulent action enabled him to obtain money, property, services or credit, and that the debt arose in the context of the fraudulent scheme."  Sheaffer, 2017 WL 377941, at *4.

### 3.  §523(a)(4)

Section 523(a)(4) provides for an exception to discharge "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. §523(a)(4).  When unpacked, this subsection of §523 also establishes three (3) distinct types of nondischargeable debt.

The first type of nondischargeable debt is found in the "fiduciary prong," which requires the creditor to establish that the debtor (1) was in a fiduciary relationship with the creditor, and (2) committed fraud or defalcation within the scope of that fiduciary relationship. See, e.g., Roemmele, 2011 WL 4804833, at *4.

The second and third types of nondischargeable debt in §523(a)(4) do not require proof of an existing fiduciary relationship, but rather, proof that the debtor committed embezzlement or

larceny, as those terms are defined by federal common law. Id. at *5; In re Burke, 416 B.R. 136, 145 (Bankr. E.D. Pa. 2009).

The Local has not raised a nondischargeability claim under the fiduciary prong of §523(a)(4).[12] Therefore, I need consider only whether the debt arose from either embezzlement or larceny.

Embezzlement and larceny are similar concepts under §523(a)(4) with one fundamental difference. Both embezzlement and larceny involve the debtor's fraudulent misappropriation of property but are distinguished by evaluating the status of the property when it came into the debtor's possession. Embezzlement occurs when the debtor initially controlled or acquired the property lawfully and then subsequently misappropriates the property; larceny occurs when the debtor initially takes possession or control of the property unlawfully with requisite improper intent. Roemmele, 2011 WL 4804833, at *6; Burke, 416 B.R. at 145.

To prove embezzlement the plaintiff must show: "(1) the debtor was entrusted; (2) with property; (3) of another; (4) which the debtor misappropriated for his own use; and (5) with fraudulent intent." Bell, 498 B.R. at 477; Roemmele, 2011 WL 4804833, at *15. A plaintiff may

---

[12]     The concept of a fiduciary is narrower under §523(a)(4) than the common, traditional understanding of a fiduciary – "a person who stands in a special relationship of trust, confidence, and good faith." See In re Librandi, 83 B.R. 379, 382 (M.D. Pa. 1995) (quoting Matter of Rausch, 49 B.R. 562, 564 (Bankr. D.N.J. 1985). Whether a party is acting in a "fiduciary capacity" is a question of federal law. See Sheaffer, 2017 WL 377941, at *3. For a fiduciary relationship to exist under §523(a)(4), there must be an express or technical trust. See, e.g., In re Bayer, 521 B.R. at 506; Roemmele, 2011 WL 4804833, at *13. This requirement encompasses a trust created by a formal trust agreement as well as "trust-type obligations ... imposed pursuant to statute or common law." Matter of Bennett, 989 F.2d 779, 784-85 (5th Cir. 1993).

Local 2187 did not press any claim that the Debtor's actions as union president were taken in a fiduciary capacity under §523(a)(4), making only made a passing reference to the concept in its post-trial brief. (See Pl's Br. at 13).

prove fraudulent intent through circumstantial evidence and a consideration of the totality of the

circumstances because a party rarely will admit to fraudulent intent. Bell, 498 B.R. at 483 (citing

Cohn, 54 F.3d at 1118–19)); In re Giquinto, 388 B.R. 152, 166–67 (Bankr. E.D. Pa. 2008).

Fraudulent intent also may be inferred from a course of conduct such as a "pattern of

concealment and nondisclosure."  Bell, 498 B.R. at 483 (citing Cadle Co. v. Zofko, 380 B.R.

375, 383 (W.D. Pa. 2007).

A finding of larceny requires proof that the debtor committed larceny as defined under

federal common law -- "the unlawful taking and carrying away of someone else's property with

the intent to deprive the possessor of it permanently." In re Esola, 606 B.R. 647, 652 (Bankr.

E.D. Pa. 2019); In re Kaltenbock, 2013 WL 3225077, at *3 (Bankr. W.D. Pa. June 25, 2013).  To

establish nondischargeability as larceny under §523(a)(4), the plaintiff must establish (1) a

fraudulent and wrongful taking; (2) of another's property; (3) with intent to convert; (4) without

the owner's consent.  The plaintiff must establish the debtor had the specific intent to commit

larceny. Roemmele, 2011 WL 4804833, at *10.  In other words, the creditor must prove by a

preponderance of the evidence that the debtor feloniously took the creditor's personal property

with the intent to convert it or deprive the creditor of it. In re Burk, 583 B.R. 655, 671 (Bankr.

N.D. Miss. 2018) aff'd sub nom, Smith v. Mid-S. Maint., Inc., 363 F. Supp. 3d 701 (N.D. Miss.

2019), aff'd sub nom, Matter of Smith, 789 F. App'x 478 (5th Cir. 2020); In re Bowie, 2010 WL

4340209, at *4 (Bankr. D. Conn. Oct. 25, 2010).  It is not enough if the debtor is merely the

recipient of stolen property; the debtor must do the original taking for it to constitute larceny

under §523(a)(4).  Burk, 583 B.R. at 671-72.[13]

---

[13]     It is possible, however, to impute the conduct and actions of the taker to the debtor if the debtor
was an active participant, knew and/or was involved in the scheme.  Burk, 583 B.R. at 671 (citing In re
Cowin, 864 F.3d 344 (5th Cir. 2017)).

### C.  The First Overpayment

The Debtor was a member of Local 2187 for twenty-six (26) years prior to assuming the presidency of Local 2187.  As a both a long-term City employee and a union member, the Debtor was familiar with the City's EP and Local 2187's Personnel Practices Code, which sets forth the rules governing status, pay, leave time, and other benefits available to Local 2187 officers and employees.  The Debtor had additional familiarity with the Personnel Practices Code during her time serving on the Executive Board between approximately 1992 and 2007 because the Executive Board reviewed the Personnel and Practices Code annually.

Once she became President of the Local, the Debtor assumed greater responsibility.  Her position gave her control over the financial operations of Local 2187, including the ultimate oversight of the payroll.  She had a duty to ensure payroll accuracy prior to sending it to the District Council for processing and she was authorized to co-sign checks.  There is likely no one else who could make changes to payroll besides the president or without the president's approval, along with the secretary-treasurer.

Given this level of control, the Debtor must bear responsibility for receiving the First Overpayment.  The critical question however, under both the "actual fraud" prong §523(a)(2) and either the larceny or embezzlement prongs of §523(a)(4) is the nature of her scienter.  Did she take and accept the First Overpayment with the requisite fraudulent intent?  The totality of the circumstances suggests that it is more likely than not (i.e., there is a preponderance of evidence) that she did  -- to the extent of the First Overpayment that she received after April 21, 2014.

On April 21, 2014, once the Debtor was publicly admonished as a "thief" during an executive board meeting, she knew that certain members had a problem with her oversight of the payroll and, particularly the level of her pay.  Then, the next month (May 2014), the Board enacted an EP Reduction, which included a reduction to the president's EP level.

While it is a close call, in light of the Debtor's long union membership and admitted familiarity with Personnel Practices Code, I have accepted the Debtor's testimony that she was unaware that she was improperly placed at EP 26, Step 5 when she first took office as president of the local.[14]  But, there can be no doubt that she was on notice of her salary overpayment following the events in April and May 2014. Yet, she took no action between April 2014 and July 2015, a period of eighteen (18) months after the April 2014 Board meeting and eleven (11) months after six (6) members of Local 2187 filed the charges against her that resulted in the First Panel Decision.

In this court, the Debtor provided no evidence and nor a credible explanation why she believed that she was entitled to the inflated EP 25, Step 5 salary after the issue was brought to her attention.  This is powerful evidence of a knowing misappropriation of union finds.

To the extent that the Debtor attempted to explain her conduct as innocent in nature, the explanation was weak and unconvincing.

The Debtor testified that it was not until August 2014, **after** she read the charges filed against her by the six (6) members of union, that she learned the problems concerning her pay were associated with both her EP and her Step.  I cannot square this testimony with the events

---

[14]        See, n.5, supra.

that occurred at the April and May 2014 Board meetings; those events were unforgettable. Similarly, I find the Debtor's claim that she was simply unaware of the problem because she did not review her pay stubs or her bank statement  --  an "ostrich" defense  --  not credible, in light of the obviously contentious relationship she had with at least some Board members and the pendency of formal charges based on claims that she was overpaying her own salary.

Based on these inferential findings, I conclude that the elements of embezzlement under 11 U.S.C. §523(a)(4) have been satisfied with respect to the portion of the First Overpayment that the Debtor received after April 21, 2014.  The Debtor controlled union funds as president of Local 2187 and then, knowingly and wrongfully, with fraudulent intent, misappropriated those funds by overpaying her own salary.[15]

---

[15]     Based on this conclusion, I need not consider whether the elements have been satisfied for a determination of nondischargeability under 11 U.S.C. §523(a)(2) with respect to the First Overpayment.

One further observation is necessary.

In its Complaint, Local 2187 asserted a claim under 11 U.S.C. §523(a)(4) without distinguishing among fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny.  In its post-trial brief, Local 2187 argued that the debt was a product of larceny, rather than embezzlement.  Nonetheless, I have determined that the debt is nondischargeable as embezzlement under §523(a)(4) for several reasons.

I perceive no prejudice to the Debtor in analyzing the evidence against the standards of both embezzlement and larceny; i.e., I do not see how the Debtor would have defended any differently had Local 2187 been more precise in focusing on the embezzlement prong of §523(a)(4), rather than the larceny prong.  This is significant because under the liberal standards for amending a complaint under Fed. R. Civ. P. 15 (incorporated by Fed. R. Bankr. P. 7015), Local 2187 would be free to amend its complaint, even after the completion of the trial.  Stated in terms of that rule of court, I will treat the issue of embezzlement as having been tried by consent.  See  Addie v. Kjaer, 737 F.3d 854, 867 (3d Cir. 2013) (quoting Douglas v. Owens, 50 F.3d 1226, 1236 (3d Cir.1995) (a determination that an issue has been tried by implied consent depends on "whether the parties recognized that the unpleaded issue entered the case at trial, whether the evidence that supports the unpleaded issue was introduced at trial without objection, and whether a finding of trial by consent prejudiced the opposing party's opportunity to respond"); see also 6A Fed. Prac. & Proc. Civ. § 1493, n.27 & accompanying text (Arthur R. Miller, Mary Kay Kane and A. Benjamin Spencer, eds., 3d ed.) (when the standards under Rule 15(b)(2) have

*[f.n. cont.]*

## B.  The Second Overpayment

The Second Overpayment of $34,563.25 consisted of wages and benefits the Debtor received from July 17, 2015 to November 30, 2015.

The Second Panel Decision noted that despite the clear determination in the First Panel Decision on July 17, 2015 (that the Debtor was improperly placed at Step 5), the Debtor made no efforts following her removal from office to adjust her Step until more than four (4) months later: November 30, 2015.[16]

At trial, the Debtor characterized this Second Overpayment as a payout that she believed she was entitled to receive based on a discussion with the administrator who took control of the operations of Local 2187 on July 17, 2015.  I took her characterization to be a suggestion that she considered herself akin to an employee who is kept on the payroll after giving notice of separation so the employer can pay out the balance of any unused, but accrued vacation and/or sick leave.

I do not find the Debtor's testimony credible.

---

*[f.n. cont.]*
been satisfied, "the theory of liability upon which the case nominally was to be tried may be changed") (citing cases).

My decision to proceed in this fashion allows for a comprehensive and final determination of this dispute, promotes the interest of judicial economy and falls within the discretion accorded to the court. See, e.g., Walton v. Jennings Cmty. Hosp., Inc., 875 F.2d 1317, 1320 (7th Cir. 1989) (affirming trial court's use of Rule 15(b)(2) to treat the pleadings as constructively amended); In re Gunsteen, 487 B.R. 887, 903 (Bankr. N.D. Ill. 2013), aff'd, 2014 WL 1125422 (N.D. Ill. Mar. 20, 2014) (a formal motion to amend the pleadings to conform with the proofs is unnecessary under Rule 15(b)(2)).

[16]     This failure to act also reinforced the Panel's conclusion that the Debtor and Fields never intended to enforce the First Panel Decision.  (Ex. P-9 at 18, n.4).

One difficulty with the Debtor's explanation is that there is nothing in the record to suggest the Debtor was informed that she was entitled to this payout after her removal from office other than her own testimony.  No testimony from a corroborating witness was presented.

Further, the circumstances strongly suggest that the Debtor was aware that she was continuing to receive union money to which she was not entitled.  She did not receive a lump sum or structured payout of accrued vacation or sick leave benefits.  Such a payout typically would not resemble the regular paycheck an employee receives after separating from her employer.  Here, the Debtor simply continued to receive her regular paycheck between July and November 2015.  (See Ex. P-9, at 5-7).  These regular salary payments were made and received even though two (2) union tribunal had determined that she was being overpaid and terminated her from her position.  It strains credulity to believe that the Debtor believed that she had any entitlement to the salary payments during the July 2015 to November 2015 period.[17]

The clinching fact in supporting these inferences from the record (with respect to the Second Overpayment) is that even after her removal from office, **the Debtor continued to receive payments at the improper EP 25, Step 5 level**.  As just stated, it is not believable that the Debtor did not notice that her compensation remained the same after her removal from office.  Nor is it likely that the rate of any possible legitimate payment for accrued vacation or sick time would coincidentally align with excessive rate of compensation the Debtor previously received.

It is possible, in my view, indeed, even more likely than not, that the Debtor was a knowing participant in a conspiratorial, fraudulent scheme involving Fields (and perhaps Bryant)

---

[17]    Frankly, I am baffled as to how or why the Debtor continued to receive compensation after she was removed from office.  Why didn't the administratorship immediately terminate her from the payroll?  Wasn't this the reason that the international union placed the Local in an administratorship in the first place after the Debtor's wrongdoing was determined?

designed to continue the misappropriation of the union funds that constitute the Second

Overpayment. For some reason, the Debtor stubbornly clung to some sense of entitlement

regarding her rate of pay and found support in her fellow officers.  The Debtor and these

individuals had a collaborative history; they ran on the same union election slate.  Bryant was the

treasurer and Fields was conveniently charged with the day-to-day responsibilities of Local 2187

after it was placed in administratorship upon the Debtor's removal.  Fields also authored the

letter to the City advising of the payout to the Debtor and orchestrated the continuation of

payments.  Thus, it requires no great stretch to infer that these individuals were working together

in a fraudulent scheme to arrange for the unauthorized salary payments to the Debtor.

Moreover, even if there was no express conspiratorial scheme, the Second Overpayment

debt arising from the Debtor's conduct still falls within the "actual fraud" exception to discharge

under §523(a)(2)(A).

As stated earlier, in Husky, the Supreme Court held that a debt is nondischargeable under

§523(a)(2)(A) if it was obtained by "actual fraud" even in the absence of a misrepresentation to a

creditor.  And, while actual fraud frequently involves conduct that may be characterized as

"deception or trickery," Husky 136 S. Ct. at 1586 (2016), the term is broad enough "to

encompass fraudulent conveyance schemes, even when those schemes do not involve a false

representation."  Id. at 1590.  The key is factor is the existence of conduct involving "moral

turpitude or intentional wrong."  Id. at 1586

Applying these principles here, I conclude that the debt created by the Debtor's knowing

acceptance of salary payments from July 2015 to November 15, 2015, after she was removed

from office (a continuation of her prior, knowing, wrongful receipt of an inflated salary) was an

intentional wrong that involved the kind and degree of moral turpitude required by

§523(a)(2)(A). Holistically, the events are sufficiently similar to a fraudulent transfer scheme, as described in <u>Husky</u>, to bring the Debtor's conduct within the purview of "actual fraud" under §523(a)(2)(A).

Accordingly, the Second Overpayment of $34,563.25 will be excepted from her discharge pursuant to §523(a)(2)(A).

### C.  The Transcript Costs

Determining whether the Transcript Costs of $2,827.95 are nondischargeable is a much closer call.

Based on the record (specifically, the Second Panel Decision), the Debtor's attorney requested the transcript. Further, the union treasurer (Bryant) bore some responsibility for the improper expenditure. But the primary responsibility rested with the Debtor and her attorney.

In short, while it is possible that the Debtor knew she was not entitled to have the union foot the bill for the transcript, the record is extremely sparse and does not permit me to draw the necessary inferences in Local 2187's favor with respect to the Debtor's scienter. Thus, Local 2187 did not meet its burden of proof and the Transcript Costs will not be excepted from discharge.

### CONCLUSION

For the reasons stated above, Local 2187 has met its evidentiary burden of proving that most of the First Overpayment and all of the Second Overpayment are nondischargeable under

11 U.S.C. §523(a)(4) and §523(a)(2)(A), respectively, but failed to prove that the debt for the

Transcript Costs is nondischargeable.

   An appropriate order will be entered.


**Date:   October 2, 2020**

                                                 **ERIC L. FRANK**
                                                 **U.S. BANKRUPTCY JUDGE**